UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| **Jordan Motta** *Plaintiff*, vs. **Paramount Recovery Systems, L.P.** *Defendant* | Case No.: Ad Damnum:  **$3,000 + Atty Fees & Costs** **JURY TRIAL DEMANDED** |

## COMPLAINT AND DEMAND FOR JURY TRIAL

**COMES NOW** the Plaintiff, **Jordan Motta** ("**Mr. Motta**"), by and through his attorneys, Seraph Legal, P.A., and complains of the Defendant, **Paramount Recovery Systems, L.P.** ("**Paramount**"), stating as follows:

## PRELIMINARY STATEMENT

1. This is an action brought by Mr. Motta against Paramount for violations of the *Fair Debt Collection Practices Act*, 15 U.S.C. § 1692, *et seq.* ("**FDCPA**") and for violations of the *Fair Credit Reporting Act*, 15 U.S.C. §1681, *et seq.* ("**FCRA**").

## JURISDICTION AND VENUE

2. Subject matter jurisdiction arises under the FDCPA, 15 U.S.C. § 1692k(d), the FCRA, 15 U.S.C. § 1681p, and 28 U.S.C. § 1331.

1

3. Paramount is subject to the provisions of the FDCPA and the FCRA and to the jurisdiction of this Court pursuant to Florida Statute § 48.193 and Fed. R. Civ. P. 4(k).

4. Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. § 1391(b)(2) because the acts complained of were committed and / or caused by Paramount within Hillsborough County, which is in the Middle District of Florida.

## PARTIES

### Mr. Motta

5. **Mr. Motta** is a natural person residing in the City of Tampa, Hillsborough County, Florida, and a *Consumer* as defined by the FDCPA and the FCRA, 15 U.S.C. § 1692a(3) and 15 U.S.C. §1681a(c), respectively.

### Paramount

6. **Paramount** is a Texas limited partnership with a primary business address of **7524 Bosque Blvd. Suite L, Waco, TX 76712.**

7. Paramount is registered to conduct business in the State of Florida, where its registered agent is **Corporation Service Company, 1201 Hays Street, Tallahassee, FL 32301**.

## **DEFENDANT IS A DEBT COLLECTOR**

8. Paramount is a *Debt Collector* within the meaning of the FDCPA, 15 U.S.C. § 1692a(6), in that it uses postal mail or another instrumentality of commerce, interstate and within the State of Florida, for its business, the principal purposes of which is the collection of debts. Alternatively, it regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.

9. Paramount is registered with the Florida Office of Financial Regulation as a *Consumer Collection Agency* ("**CCA**"), holding license number **CCA0900537. SEE PLAINTIFF'S EXHIBIT A.**

## **FACTUAL ALLEGATIONS**

### **Mr. Motta Shot by Armed Robber**

10. On or around February 6, 2019, Mr. Motta was approached by an unknown armed robber who demanded Mr. Motta turn over his wallet and phone to him; Mr. Motta refused.

11. The unknown armed robber shot Mr. Motta in the right arm at close range and fled.

12. A family member called 911, and emergency responders transported Mr. Motta to the hospital, where he received emergency medical treatment.

13. Purportedly, a portion of the treatment rendered to Mr. Motta was performed by a hospital subcontractor, Emergency Medical Associates of Tampa Bay, LLC ("**EMA of Tampa Bay**").

14. Mr. Motta had medical insurance.

15. However, EMA of Tampa Bay failed to seek reimbursement from Mr. Motta's insurance carrier, later claiming $983 was owed by Mr. Motta (the "**Debt**").

16. The Debt did not arise from a written contract between EMA of Tampa Bay and Mr. Motta or any verbal or written agreement to pay EMA of Tampa Bay any particular amount for its services.

17. Around December 11, 2020, EMA of Tampa Bay, or an unknown successor-in-interest to the Debt, assigned the Debt to Paramount for collection.

**Paramount Obtains Credit Report Under False Pretenses**

18. Because the debt arose from services which were for family, personal, or household purposes, specifically, *personal medical services*, the Debt meets the definition of *Debt* as defined by the FDCPA, 15 U.S.C. § 1692a(5).

19. While the debt is a **consumer debt**, it is not a **"credit transaction"** under the FCRA. *See* 15 U.S.C. § 1681b(a)(3)(A).

20. To lawfully request a *Credit Bureau Report* ("**CBR**") from a *Consumer Credit Reporting Agency* ("**CRA**"), a debt collector must be collecting a debt which

4

arises from a *Credit Transaction* involving the consumer. *See* 15 U.S.C. §1681b(a)(3)(A); *Pigg v. Fair Collections & Outsourcing, Inc.*, No. 1:16-CV-01902-JMSDML, 2017 WL 3034266, at *4 (S.D. Ind. July 18, 2017) (holding that a debt collection agency did not have a permissible purpose because, even where a debt exists, a "credit transaction is a necessary prerequisite" for § 1681b(a)(3)(A)).

21. A *Credit Transaction* involving the consumer is one in which the consumer voluntarily participates and enters into an agreement to receive goods or services in advance of payment, with the consent of both parties. See *Pintos v. Pacific Creditors Association*, 504 F. 3d 792, 798 (9th Cir. 2007); *Miller v. Trans Union LLC*, No. 06 C 2883 at *7 (N.D. Ill. Feb. 28, 2007); *Rodriguez v. Experian Info. Sols., Inc.*, Case No. C15-01224RAJ, at *9 (W.D. Wash. Jul. 25, 2016).

22. While a patient in clear need of medical attention is presumed to consent to medical treatment and can be held legally liable for the payment of reasonable fees, Mr. Motta did not make an *affirmative* request for deferred payment arrangements.

23. Mr. Motta did not ask to be treated by EMA of Tampa Bay; rather, emergency medical service workers determined that his condition required evaluation by specially trained doctors in response to a 911 call made by another person.

24. Mr. Motta did not engage in a voluntary request for services for which he agreed to pay later.

5

25. The services rendered to Mr. Motta when he was incapacitated did not create a *Credit Transaction* under the FCRA because the Debt was not voluntarily incurred, nor were extended payment terms requested.

26. Moreover, to be a *Credit Transaction,* there must be a creditor, *e.g.,* EMA of Tampa Bay, who agrees to provide goods or services while allowing the consumer to make payment at a later date.

27. However, Paramount reported the purported Debt as an unpaid collection account to multiple nationwide CRAs, stating to the CRAs that the Debt was due and payable *the same day* services were incurred.

28. This is evidenced by the fact Paramount reported February 6, 2019, as the *Date of First Delinquency* ("**DOFD**") to Equifax Information Services, LLC ("**Equifax**") when it reported the Debt as an unpaid collection account for which Mr. Motta was solely liable. **SEE PLAINTIFF'S EXHIBIT B.**

29. A debt which Paramount reports as delinquent beginning February 6, 2019, and which was for emergency medical services rendered on February 6, 2019, is inherently not a *Credit Transaction* because no delayed payment terms were offered by EMA of Tampa Bay to Mr. Motta.

30. Therefore, Paramount knew the transaction was not a *Credit Transaction*, as it reported that the Debt was past due on the very day it was allegedly incurred.

6

31. Despite this knowledge, on or about December 11, 2020, Paramount requested a CBR from Trans Union LLC ("**Trans Union**"), another nationwide CRA, for collection purposes. **SEE PLAINTIFF'S EXHIBIT C.**

32. Paramount intended to, and did, use the wealth of information provided by Trans Union regarding Mr. Motta in its efforts to attempt to collect the Debt from him.

33. A debt collector must be collecting a debt which is a "credit transaction involving the consumer," 15 U.S.C. 1681b(a)(3)(A), to lawfully request a CBR regarding a consumer debt.

34. Debt collection is a permissible reason for obtaining a credit report **only** when a debt arises from a transaction in which the debtor **voluntarily and directly seeks credit**." *Baron v. Mark A. Kirkorsky, P.C.* (Case No. 17-cv-01118, U.S.D.C., District of Arizona) (**Emphasis added.**)

35. Because the debt did not involve a *Credit Transaction*, Paramount did not have a permissible purpose under the FCRA to obtain a CBR from Trans Union.

36. Upon information and belief, Trans Union requires a debt collector to certify that it has a permissible purpose to obtain a report when requesting a CBR; therefore, to obtain Mr. Motta's report, Paramount falsely certified that it had such purpose.

37. If Paramount lacked a permissible purpose to obtain Mr. Motta's report when it requested a CBR for consumer debt collection purposes, Paramount made a misrepresentation in connection with the collection of a consumer debt.

### Paramount Reports Non-Reportable Debt to CRAs

38. Paramount reported the Debt to at least three nationwide CRAs as an unpaid collection account, severely damaging Mr. Motta's credit report and scores.

39. Reporting a debt to a CRA is an attempt to collect the debt alleged therein. *See, e.g., Edeh v. Midland Credit Management, Inc.*, 748 F. Supp. 2d 1030 (D. Minn. 2010) ("The Court has learned, through its work on countless FDCPA cases, that threatening to report and reporting debts to CRAs is one of the most commonly-used arrows in the debt collector's quiver.")

40. The **Consumer Data Industry Association** ("**CDIA**") is an international trade association, representing over 140 members involved in credit reporting, mortgage reporting, check verification, tenant and employment screening, collection services, and fraud verification services. The CDIA is active in both federal and state legislative affairs, public relations, education, and the promulgation of industry standards.

41. Because consumer credit reporting information is such sensitive data, with far reaching implications for consumers, the CDIA works together with CRAs

to develop, maintain and enhance industry-standard reporting formats and guidelines.

42. In cooperation with major CRAs such as Trans Union and Equifax, the CDIA publishes Metro 2 reporting standards ("**Metro 2**") to assist furnishers with their compliance requirements under the FCRA.

43. Metro 2 standards provide uniformity in the reporting and interpretation of credit data, including credit risk scoring.

44. FICO® credit scores, developed by the Fair Isaac Corporation, are the most commonly used credit scoring system in the United States.

45. FICO® credit scores utilize data reported by CRAs and furnishers which are, ostensibly, in compliance with Metro 2 standards.

46. Paramount knows, or should know, that entities who perform credit risk scoring (*e.g.,* FICO scores) and other functions utilizing the data reported by Paramount assume Paramount's compliance with Metro 2 standards in reporting consumer information.

47. In March 2016, the major CRAs announced their *National Consumer Assistance Plan* ("**NCAP**"), which was implemented to prevent further action from federal regulatory agencies.

48. The major CRAs provided copies of this new guidance to their furnishers of data, including Paramount, in May 2016.

49. Metro 2 guidelines were updated as part of the NCAP and, effective June 15, 2016, debt collectors were instructed to *not* report debts that "did not arise from a consumer contract or agreement to pay."

50. The Debt – even assuming, *arguendo*, Mr. Motta is somehow liable for it – clearly did not arise from a consumer contract or agreement to pay.

51. Despite this guidance being in effect for more than three years, Paramount reported the $983 "debt" to the major CRAs multiple times.

52. In February 2021, Mr. Motta disputed Paramount's reported information to Experian, stating that he had no debt for which he was liable or for which was properly categorized as a credit transaction.

53. Experian sent Paramount an *Automated Consumer Dispute Verification* Request ("**ACDV**") through a system known as e-OSCAR.

54. Paramount responded to the ACDV, stating that its tradeline was correct and required no modification of any kind. **SEE PLAINTIFF'S EXHIBIT D.**

55. If a furnisher of data to a CRA decides to report disputed information as verified, "the question of whether the furnisher behaved reasonably will turn on whether the furnisher acquired sufficient evidence to support the conclusion that the information was true." *Hinkle v. Midland Credit Management, Inc. (11th Cir.) 827 F.3d 1295 (2016)*

56. Paramount's verification of factually impossible information, *e.g.*, a non-reportable debt pursuant to Metro 2 guidelines was, somehow, actually a

reportable debt, establishes its procedures to investigate disputed information were derelict. Beyond this, Paramount could not have obtained information suggesting this was true because it is not true. Paramount quickly clicked a check-box on the electronic ACDV, confirming its report was accurate, with no real investigation.

57. ACDVs sent via e-OSCAR contain a field for a data furnisher to report one of the ten Metro 2 *Compliance Condition Codes* ("**CCCs**") to notate the status of an account, such as "disputed by consumer" or "previously disputed."

58. When Paramount returned the ACDV, it failed to report a CCC of any kind.

59. Paramount thus failed to report the account as *Disputed by Consumer*.

60. There is no plausible explanation as to how Paramount could determine that Mr. Motta did not dispute the information appearing on his report.

61. Paramount's unilateral determination that Mr. Motta supposedly did not dispute the Debt – originating from him being shot on the street in an armed robbery attempt, which Paramount had reported as a "voluntarily acquired" debt – did not nullify Mr. Motta's dispute, and Paramount knew Mr. Motta still disputed that he actually owed the Debt and, moreover, that he disputed the transaction properly belonged on a *credit* report.

62. Paramount's failure to report a CCC is further evidence that it failed to conduct a reasonable investigation into Mr. Motta's dispute.

63. Paramount's failure to disclose that the Debt was disputed materially damaged Mr. Motta's credit scores, since most credit scores, including most versions of FICO®, the most commonly used scores in the nation, will disregard medical collection tradelines reported with the "XB" CCC indicating that the consumer disputes the debt.

64. The failure to properly report a disputed debt as disputed creates a concrete injury-in-fact, since Mr. Motta suffered "a real risk of financial harm caused by an inaccurate credit rating." *See Evans v. Portfolio Recovery Associates*, 889 F. 3d 337, 345 (7th Cir 2018).

65. Further, communication of credit information known to be false in "violation of §1692e(8) is sufficient to show an injury-in-fact… An inaccurate credit report produces a variety of negative effects." *Id.*

66. Paramount's reports of the Debt to the CRAs were *Communications* as defined by 15 U.S.C. § 1692a(2) and were done in connection with collection of the debt.

67. Mr. Motta has hired the aforementioned law firm to represent him in this matter and has assigned his right to fees and costs to such firm.

## COUNT I
## VIOLATIONS OF THE FDCPA

68. Mr. Motta adopts and incorporates paragraphs 1 – 67 as if fully restated herein.

69. Paramount violated **15 U.S.C. § 1692e(2)(a)** when it made a false representation about the character and amount of a debt by: (a) representing to Trans Union in December 2020 that the Debt stemmed from a *Credit Transaction* involving Mr. Motta when it did not; and, (b) representing to the CRAs that the Debt arose from a contract or agreement to pay, when it did not, and was thus unreportable.

70. A debt collector's actions are subject to strict liability under 1692e(2)(a); *see Randolph v. IMBS, Inc.*, 368 F.3d 726, 730 (7th Cir. 2004) ("[Section] 1692e(2)(A) creates a strict-liability rule. Debt collectors may not make false claims, period.").

71. Paramount violated **15 U.S.C. § 1692e and 1692e(10)** when it made false and misleading representations in an attempt to collect a debt and/or obtain information about Mr. Motta by: (a) representing to Trans Union in December 2020 that the Debt stemmed from a *Credit Transaction* involving Mr. Motta when it did not, in a successful effort to obtain information about Mr. Motta to which it was not legally entitled; and, (b) representing to the CRAs that the Debt arose from a contract or agreement to pay, when it did not, and was thus unreportable.

72. Paramount violated **15 U.S.C. § 1692e(8)** when it communicated credit information known to be false, or which it should have known to be false, when it certified to Trans Union that the underlying debt which Paramount was

requesting a credit report in connection with the collection thereof was a *Credit Transaction*, when it was not.

73. Paramount violated **15 U.S.C. § 1692e(8)** when it communicated credit information which was known to be false, when it certified to at least three CRAs that the underlying debt had resulted from a consumer contract or agreement to pay, when it knew, or should have known, it had not.

74. Paramount's conduct renders it liable for the above-stated violations of the FDCPA.

**WHEREFORE,** Mr. Motta respectfully requests this Honorable Court enter judgment against Paramount for:

    a.    Statutory damages of **$1,000.00**, pursuant to 15 U.S.C. § 1692k(a)(2)(A);

    b.    Unspecified actual damages, pursuant to 15 U.S.C. § 1692k(a)(2)(A);

    c.    Reasonable costs and attorneys' fees pursuant to 15 U.S.C. § 1692k(a)(3); and,

    d.    Such other relief that this Court deems just and proper.

## COUNT II
## VIOLATION OF THE FCRA

75. Mr. Motta adopts and incorporates paragraphs 1 – 67 as if fully stated herein.

76. Paramount violated **15 U.S.C. § 1681b(f),** either willfully and intentionally, or recklessly and without regard for a consumer's rights, when it requested a credit report regarding Mr. Motta without a permissible purpose to obtain the report.

77. Mr. Motta has been damaged in that his personal and highly confidential information has been obtained by an entity with whom he did not consent and which had no other permissible purpose to obtain such information.

78. Paramount violated **15 U.S.C. § 1681s-2(b)** when it failed to make a reasonable investigation after notice of dispute from Experian concerning the Debt since its investigation failed to determine that a debt which was not reportable pursuant to Metro 2 guidelines was, nonetheless, reportable. Paramount also failed to conclude in its investigation that its information was no longer complete and accurate without amending the data to reflect that Mr. Motta disputed the reported information, and thus required modification to reflect this.

79. Paramount's conduct renders it liable under the FCRA to Mr. Motta in a statutory amount up to $1,000 *per incident*.

**WHEREFORE,** Mr. Motta respectfully requests this Honorable Court enter judgment against Paramount for:

  a. The greater of statutory damages of **$1,000** for each violation of the FCRA (for a total of **$2,000**) or Mr. Motta's unspecified actual

        damages, pursuant to 15 U.S.C. § 1681n(a)(1)(A) or 15 U.S.C. § 1681o(a)(1);

  b.    Reasonable costs and attorney's fees pursuant to 15 U.S.C. §1681n(a)(3) and / or 15 U.S.C. § 1681o(a)(2); and,

  c.    Such other relief that this Court deems just and proper

## JURY TRIAL DEMANDED

Mr. Motta hereby demands a jury trial on all issues so triable.

Respectfully submitted on **March 22, 2021**, by:

           **SERAPH LEGAL, P.A.**

           /s/ *Brandon D. Morgan*
           Brandon D. Morgan, Esq.
           Florida Bar Number: 1015954
           BMorgan@SeraphLegal.com
           /s/ *Thomas M. Bonan*
           Thomas M. Bonan, Esq.
           Florida Bar Number: 118103
           TBonan@SeraphLegal.com
           1614 N. 19th St.
           Tampa, FL 33605
           (813) 567-1230
           *Counsel for Plaintiff*

**ATTACHED EXHIBITS LIST**
A    Paramount's Florida CCA License
B    Plaintiff's Equifax Consumer Disclosure, March 6, 2021, Excerpt
C    Plaintiff's Trans Union Consumer Disclosure, January 11, 2021, Excerpt
D    Plaintiff's Experian Consumer Disclosure, March 5, 2021, Excerpt